Good morning. My name is Mike Tabler. I'm a lawyer from the big town of Ephrata, Washington. It's my privilege, my pleasure, to represent Cenex in these proceedings. The district court's order at page 2 characterized these proceedings as a complicated bankruptcy matter. That's simply not the case. The issues before the bankruptcy court focused on a couple of things. First of all, the rather straightforward consequences of a mistaken or erroneous termination statement. And then secondly, lean priority issues, which are controlled by statutes as well as well-established case law. The bankruptcy court judged the credibility of the witnesses, it weighed the evidence, and then it arrived at a result that was supported by the facts and the evidence as well as the law. Nonetheless, the district court assigned reversible error to one of the bankruptcy court's findings of fact, a portion of finding fact 25, as well as four of the bankruptcy court's conclusions of law, conclusions of law 5, 6, 8, and 9. Cenex is appealing that district court order, and today it's asking that this court reinstate and affirm the original judgment of the bankruptcy court in all respects. Can I ask you a question? Certainly. What's the specific evidence in the record that supports your contention that the stand-back agreement provided that Cenex would be paid for its 1998 inputs with funds from the crop proceeds? And also, as sort of a part of that, is there any evidence other than the testimony of Cenex's representative, Mr. Davis? The answer is yes. And you're asking specifically about the crop proceeds, correct? Right. The 1998 proceeds in terms of that. Because you've obviously contended that the stand-back agreement provided that Cenex would be paid from the 1998. And to answer your question, then, the evidence in the record regarding the subject of the crop proceeds begins with the budget that the bank prepared. Remember, of course, Steffler was a farmer. The only income he has comes from crops. The bank then prepared this budget showing that flow of crop proceeds and showing, according to the bank's own testimony, Mr. Weimer testified, that there were sufficient proceeds not only to pay the bank but also pay Cenex and have $307,000 of what he called net margin to be applied to Cenex's carryover debt. There's that evidence. The next body of evidence was the three different statements by the Cenex manager, Mr. Davis, specifically saying, I'm going to get paid from crop proceeds as well as loan proceeds. So that's the evidence in the record. Now, in terms of just in the normal course of farming and stand-back agreements, when do stand-back agreements occur in the normal, you know, is that? Oh, I wouldn't say that there is a norm for this. I think it's strictly a case-by-case deal. Okay. Okay. I wanted to comment that I think the district court's order is hard to understand because, in my view, the analysis is legally and factually inconsistent, and it's just plain wrong as a matter of law. And, for example, the bankruptcy court concluded as a matter of law, Conclusional Law No. 6, that the Cenex crop lien and financing statement, both of which were filed in 1998, created valid enforceable rights to these crop proceeds that were senior and superior to any competing claim by the bank. At page 27 of its order, the district court agreed with this conclusion. It agreed that after the bank filed its termination statement, the Cenex crop lien and financing statement did, in fact, as a matter of law, have priority. Then, without any explanation, it decides to overrule Conclusional Law No. 6. It held that the bank's 1999 financing statement, after the fact, had priority over the previously filed financing statement of crop lien and Cenex to the extent that Cenex would take 98 proceeds and pay 96 and 97 debt. The district court didn't cite any authority whatsoever to support that proposition, and the reason why is because there isn't any authority to support that proposition. There aren't any statutes. There aren't any cases that allow the bank to file a financing statement in 1999 and then somehow be afforded priority ahead of previously filed liens and financing statements. Now, there is an exception of sorts that's mentioned in the Esparza case, and is also codified in RCW 6011050, explaining that financing statements for current year financing can prevail over a previously filed financing statement if that previous financing statement doesn't involve current year financing. But in those circumstances where the previous creditor, the first-in-time creditor, can trace proceeds to current year financing, then they will have priority under the first-in-time first-in-right rule. Well, here, the bank terminated its financing statement, and even if it didn't, it couldn't trace one dime of any of its 1998 advances to production in 1998 crops. And, in fact, at page 5 of this order, the district court identified the bank's inability to trace as an undisputed fact. So regardless of whether the bank filed before or after Senex, there isn't any legal authority to support the district court's decision to overrule Conclusion of Law No. 6. As you say, along those same lines, but not exactly the same points you're making, when Senex endorsed the checks over to the bank, did that constitute any kind of waiver? It did not, and I was about to come to that. The reason it didn't constitute waiver is because, of course, waiver is the intentional relinquishment of a known right. The district court goes through this analysis to find waiver, and I think that was Conclusion of Law No. 8. And in order to do that, what the district court said is, Well, I'm going to impute knowledge to Senex of the bank's termination statement at the time it signed off on these checks. Once again, there's no authority cited, no authority exists, that would enable a district court to impute knowledge. In fact, under the Uniform Commercial Code, it's 1201 subpart 25, the Uniform Commercial Code says that knowledge has to be actual knowledge. There's no such thing as imputed knowledge in the Uniform Commercial Code for this sort of issue. For termination agreements? Are we for termination statements? Certainly. For anything. You must have actual knowledge under the law. How about financing statements that are properly filed? Financing statements. Once again, you have to have actual knowledge. That's just the rule. And then this case talks about the termination statement. So when the district court fabricates this reason that it can impute knowledge, which is directly opposed to what the statute said, there is no waiver. Why shouldn't Senex be charged with constructive knowledge? Because that's not what the code provides. There is no such thing as constructive knowledge under 1201 sub 25. It talks about when you have knowledge. You have knowledge when these things occur. Actual knowledge, actual notice. There is no legal authority to assign constructive knowledge. It seems that there's no doubt that the termination notice was mistakenly filed. That's true. And up until that point, it would appear that Senex thought that the bank had a superior interest. Remember, the bank was telling it that it did. Well, but whatever. They went along with it. They seemed to be behaving in a way. So I think that the bank cites certain cases where, you know, they're asking for some sort of equitable relief from that. Why does this case not fall into the category of the cases that they cite? Because, remember, we're talking about a mistaken termination statement. There isn't a single case out there that says that you can rely on equity as a basis for avoiding the consequences of your mistaken or erroneous termination statement. It would make you wonder why would you even have a financing statement if you could avoid it that easily. So there's no legal authority for that sort of result. Well, it's your strongest argument that in some of the cases that they cite, there isn't a third party being hurt as far as that goes. You know, say if, you know, you know you owe the money, but then they file some sort of termination notice. Well, you have the benefit of it. You owe the money. But here, Senex was planning to get their money. It was just a question in what order. Well, really, this agreement didn't do anything more than confirm what the law is anyway. Remember, again, the bank couldn't trace a dime of its advances to this crop, even if the bank had not terminated its financing statement. And forget about the stand-down agreement. And Senex wanted to get paid. Under Esparza, Senex is going to get paid because all of its inputs occurred in 1998 and were covered by the crop lien as well as its financing statement. Since the bank couldn't trace, it loses anyway. And that's what the bankruptcy court found. Yes, indeed. Thank you. The hardest part for me in trying to decipher the district court's order was its decision to overrule, I think it was conclusion of law. Bear with me just a moment. Number eight. That's the conclusion where the bankruptcy court concluded that the bank couldn't avoid the consequences of a termination statement by claiming to have received these proceeds in the ordinary course of business. The district court looked to the code comment as a basis for its decision to overrule conclusion of law eight, and it did things, it did essentially two things to justify this decision. First of all, it engaged in statutory construction and concluded that somehow the Washington legislature must have intended that this code comment have precedential value. Secondly, then, it went into a discussion and an analysis of the various cases that addressed that code comment. Now, I'm not going to talk about the misguided attempt at statutory construction. Not even the bank attempts to justify or explain that away in its brief. I wanted to talk briefly about the cases. Again, the cases explain that payments are not in the ordinary course of business. If a payee knew of or was reckless about whether those payments violated a third-party security interest. Here, the bank, after filing a termination statement, knew that its receipt of proceeds was contrary to the Senate's lien and financing statement. It knew that the debtor was a default. It knew that the debtor couldn't pay his loans. In fact, it knew that at the time it drafted the new loan documents. It knew that it had created a false and inaccurate financial statement. Did the district court really even analyze recklessness? I don't think so. It seems to me that it did engage in some discussion of that. When it concluded on the Holder and New Course argument, remember there, the court said, no, you're not an HGC because you didn't act in good faith. And it ticked off the facts that it said demonstrated the bank's lack of good faith. It completely ignored those same facts when it found that the bank could nonetheless receive payments in the ordinary course of business. So, no, I don't think the district court thought about that at all. So, once again, the decision to overrule a conclusion of law number eight was just plain wrong as a matter of law. Conclusion of law five set out the bankruptcy court's conclusion that the bank breached its understanding of the sentence and the sentence would be paid from prop proceeds and not from the debtor's operating loan. It decided that the bank did not agree to make loan advances to sentence. Well, this portion of the court's order doesn't cite any legal authority, and it's completely at odds with unchallenged findings. Did the bank continue to assert priority even after it knew it had filed the termination agreement? A number of times, including written correspondence that the Senate received in December of that year saying, here's our notice under the Food Security Act that we claim a perfected security interest in these crops. And then, of course, it did so specifically at the February meeting in 1999 when the parties got together and said, the Senate said, okay, we're ready for our own advances to get paid now. And the bank's special credits officer said, no, we're not going to do that. We have the perfected security interest, and you have to sign these checks for us. Well, was the first time that the bank changed its tune on that when Senex pointed out to the bank that the termination? The following month, in March of 1999, Senex conducted its lien search and confronted the bank and said, wait a minute. You guys terminated. Here's our lien. Here's our financing statement. We want the money back. The bank didn't give any money back, but it's interesting to note that the three checks, I think it was three checks that came in after that confrontation, the bank agreed that Senex got that money. Okay, so in terms of when the termination agreement was filed and when Senex confronted the bank, what were the dates on that? The termination statement was filed in October of 1998. There were repeated representations between October of 98 until February of 99, both written and oral, that the bank claimed to have a perfected security interest. In March of 99, Senex confronted the bank with its lien search. Okay, thank you. I have two questions for you. With respect to conclusion of law number five that the bankruptcy court rendered? I'm sorry. Conclusion of law number five by the bankruptcy court. Correct me if I'm wrong, but the district court seemed to understand that or interpreted that to mean that Senex was entitled to be paid directly by the bank. Well, I'm not sure why the district court put that twist on it. Does it make a difference at all? I don't think so. You know, the bank represented that there was money to be advanced to cover Senex. It gave those assurances repeatedly, even after having filed its financing statement, even after the debtor defaulted, and then it came out with that explanation. I can't track with the district court in that regard. It doesn't make any difference. Okay. My second question is, are you asking us to affirm completely what the bankruptcy court did? Yes, I am. Total dollar amount? Yes, I am. That's exactly what I'm asking for. Did you want to save some time for a rebuttal? Nope. In fact, you've covered the stuff that I have. That's fine. You got $340. That's it. First time I've heard that. This case, to me, has always been very straightforward. The thing that makes it complicated is all these off-the-wall arguments that attempt to explain why we can avoid the consequences of a termination statement and get money after we've engaged in this conduct of falsifying financial statements, falsifying budgets, and then lying to cynics about who had the perfected security interest. Nonetheless, you've got three minutes and 15 seconds for a rebuttal. All right. We'll hear from the bank. Good morning. Good morning, Judge. May it please the Court in opposing counsel, my name is Doug Fedderspiel, and I'm here representing U.S. Bank this morning. Mr. Tabler indicated that, in his opinion, this was not a complex bankruptcy case. I agree with him that bankruptcy issues aren't at the central core, but I respectfully disagree with opposing counsel. I believe this is a complex case. And the reason I believe that is because two extremely intelligent judges, Judge Rosmeisel and District Court Judge Shea, have looked at this case and come to opposite conclusions. It's a difficult, complex, presents difficult and complex legal issues. I'd like to focus on two of the areas on appeal, one in response to Cenex's appeal regarding the issue of waiver, and one regarding equitable reinstatement. The policy issues behind waiver stem from a tension between the idea advanced by Cenex that they would have to have actual knowledge of the termination statement using the definition under 120125 versus the idea or the concept of constructive knowledge that the code is built around under Section 9 when we're talking about financing statements and termination statements. There is a one. 12025 does provide a definition of notice. It seems to play throughout the code. Is that correct? That's correct. Right. But what I. You know, it does contemplate constructive notice. Correct. In subdivision C, where it says, from all facts and circumstances known to him or her at the time in question, he or she has reason to know that it exists. Correct. So it does contemplate constructive notice. But how could you say here that under all those facts and circumstances, they had constructive notice of the termination agreement? Because by. I mean termination statement. I'm sorry. Because by law in the cases I've cited in the briefing, the filing of a termination statement provides constructive notice just as the filing of a financing. What's the best Washington case that says that? I. You've got me cold on the citation in the brief. I'm sorry. I could. I don't recall there being any cases under Washington law that said that. That's correct. I believe the citation was a citation out of the Oregon State court. Right. But I don't recall the case name off the top of my head. But. What's the purpose of the filing requirement for a termination statement? Constructive notice to the world that the previously filed financing. Let me ask you this. It's my understanding that when you file a financing statement, the financing statements have the self terminate. Is that correct? At the end of a period of time, which is five years, unless they're automatically unless they're renewed within a six month timeframe before the termination, they automatically cease to have any effect of nature. Yes. So is it customary to routinely search for financing statements? I believe so. Does the same practice exist with respect to termination statements? I would believe so. And in this case. Why do you say I would believe so? I believe so. Is there anything in the record? Is there anything in the record that says that indicates that? Yes. Because although I don't have personal knowledge, the knowledge in the record was the manager, the finance manager who had been asked to run a UCC financing search, statement search, I believe, in August of 1998. And Senex delayed. He had no explanation for that. And he delayed that search until late February of 1999. We have a whole other layer of things going on. You know, the bank arguably even at some point, you know, you've got someone doing this. It clearly was an error. The bank would take that back in two seconds if they could. And the bank is still asserting its superiority with Senex. And if Senex thought that it had any chance, you know, Senex is going along with it for whatever reason, and the bank doesn't change its story until Senex says, look at this. I believe if you look at the record, the representations about the timing of the representations is muddied by Senex. The representation regarding the written letter that went out was dated in late December and never received until January after the transactions had issued. The only statement in the record by the U.S. bank representative came in late February. It was checked out by Senex and turned out to be false. And when U.S. bank was confronted with that in late February, they turned around and allowed Senex to take the March checks. So the record does not support the allegation that U.S. bank either represented orally or in writing to Senex that it had a first position at the time of the checks in question in this case. And that really, in my mind, frames the waiver issue based upon what kind of notice one has to have. Is there anything in the record that shows that Senex actually knew? That the termination statement had been filed? Yes. No. Under normal principles of waiver, actual knowledge is required. What do you rely on to show that constructive knowledge is enough? In Washington State, constructive knowledge and actual knowledge can form the basis for waiver. That varies from state to state and may be contradicted by other states such as Nevada or California. But in Washington State, the cases I've set for establish a constructive knowledge is sufficient for waiver. So your contention that there was constructive knowledge is the simple fact that the termination statement had been filed. Just the filing of it was, it gives constructive notice. Correct. And the reason that we take that position. But let me ask you this. Is the, you know, in real estate transactions, recording your deed down at the county recorder's office gives constructive notice to everybody. Correct. Does the same principle apply to financing statements and termination statements? And if so, where do you, where is the authority for that? Yes. The argument or the authority that I've cited comes from the case that I cited regarding the U.S. Bank v. Oliverio case. It's a Washington case. And that dealt with the mistaken termination of a deed of trust. And they talk about the concepts of the. That was a real estate transaction, though, wasn't it? That was. But in that case, the Washington courts talked about the similarities between the UCC and the real estate recording policies in terms of notice and the purposes for the different filing requirements. Otherwise, if we didn't have that constructive notice, any time any of these transactions were taking place, everybody could Monday morning quarterback who should have gotten the checks. One difference is the difference between a termination of a financing statement and the initial notice that's granted by a financing statement. That seems to me there's a difference. Yes. And that is the second policy argument that I think this case presents to this panel to clear up for practitioners such as representatives of Senate and U.S. Bank. We've got the disparity between 9402 and 9404. In the case of Pacific Trencher and the small handful of cases from around the nation that have dealt with the issue presented by this case, which is equitable reinstatement, the policy that we're looking at is a head-butting between 4048, which allows the reformation of a financing statement in the event that there is a non-misleading mistake that can be easily rectified clerical error, and 402, which deals with termination statements. And it's clear that under those two code provisions, those two are separate and distinct code provisions. Under 402, the question is, and it has never been addressed by any court of this circuit or of the nation that I can find, does 402 replace or displace the equitable provisions and remedies of 1103? And I submit that due to the clear statement of the Ninth Circuit that unless there is a specific statement in the code section displacing 103 that is allowed for in 404 subsection 8, it is not displacing equitable remedies. I would like, and I'm asking on behalf of my client, for this Court to rule that the termination provisions of 402 do not replace or displace the equitable remedies under 103. And the equitable remedies sought here, equitable reinstatement, is allowable. Well, let me ask you this. In terms of your requesting equitable reinstatement, and here's the things that I want you to address in that. Obviously, one of the cases that you cite, U.S. Bank v. Oliverio, that it doesn't appear to be any doubt here that this was inadvertently terminated. But in the banks owed money and Senex was owed money, and we've got a bankrupt. And so it's a question about who's, you know, there's not enough to pay everyone. So who's going to get paid and in what order they're going to get paid? But in Oliverio, the Court was concerned because the debtor would receive a windfall in that situation. We don't have the exact same situation here. Plus the fact that we've got some, whether you believe them or not, or whether the bankruptcy court, you know, how these credibilities were resolved, there's some indications that the bank did some manipulation with the financing statement. The bank did, you know, the bank's the one that made the mistake. And third parties' rights are affected here. Senex will not get money if you reinstate this and bump their priority. And then there isn't any showing in the record of tracing the money, and the bankruptcy court made those findings. So why should you get equitable reinstatement? Well, in this case, the equitable reinstatement is based on the fact that but for that mistake, and everybody admits it's a mistake, Senex would not be entitled to a dime because all of the money would have gone to U.S. Bank. The tracing issue, I think, is an unfortunate use of the term in the context of the opinion because although it couldn't be traced in the sense we couldn't take $10 and show that that $10 were spent for gas, the record is clear that all of the money that was loaned in the 1998 operating loan, except for $3,000 a month, was used for the crop that was grown by Mr. Steffler, and that was uncontroverted. So we shouldn't even concern ourselves that the bank did nothing to show any tracing? Correct. You don't have any responsibility to do that? I agree because it did the same thing that Senex did. It said all of the money went to farming. Isn't Senex a distributor of supply inputs? That's correct. So that's a bit different than what the bank does? And Senex typically deals with farmers who deal on multiple farms. And in this case, there was only one farm, and the assumption was made by counsel of the parties in the court, because we were only dealing with one debtor and one farm unit, that all of the money went to that farm unit, and to the same extent, because the operating line with U.S. Bank was to one debtor and one farm, all but his living expenses went to the farming operations. So we've got the same level of traceability, if you want to use that term, with Senex as we do with the bank. So are you relying on the initial financing statement to show traceability, or is it the 1999 loans that we're talking about? We are relying on the original financing statement to provide us with the priorities, in the event that the court equitably reinstates that original financing statement. In the event they do not, we are relying on the filing statement filed in early 1999 to say the same thing, that the 19- Why wouldn't Senex's be the priority, because all of it was clearly shown to go to the 1998 crop, whereas the 1999 one would seem to come afterward and wasn't really shown to be all to the 1988 crop? I believe that that would be a correct statement of law. In the event you do not equitably reinstate the earlier security agreement, Senex's 1998 crop lien would take priority to the extent of the 1998 inputs over the subsequently filed crop lien of U.S. Bank. But that second crop lien would then get to use, U.S. Bank would get to use it to recoup its 1998 inputs before Senex could then begin to recoup its 1996. Why would that come first? Why? They would come first to get the 1998 inputs recouped before they could begin to use prior year's inputs. So you look at the year in question. But the specific Frencher case court's opinion, if you study that opinion from 20 years ago, that appellant was asking for equitable reformation of a security interest, not equitable reinstatement as a result of a termination statement. And that Ninth Circuit opinion from 1984 was brought up from a district court opinion that was filed and talked about the case that we cited and relied upon, that's the Henry Burkhardt case, the Ohio case from 1969. And in that case, that presents an issue that I respectfully disagree with the opposing counsel. That presents us with an issue that addresses your concerns about affected third parties. There was a termination statement of a security interest in that case, but the termination statement came after the bankruptcy trustee acquired his super priority lien by the filing of the bankruptcy. And in that case, the court said to not reinstate it would provide the trustee with an inequitable windfall. And in that case — A year ago, Cenex isn't getting anything it's not entitled to. There's just not enough to go around. Cenex was entitled to be paid out of the operating loan. And the reason Cenex didn't get paid was because their farmer, their client, Mr. Steffler, simply chose not to tap the available operating line and pay them. The record is clear that there was sufficient ability for Mr. Steffler to pay out of his operating line, Cenex, every dime it was owed. Mr. Cenex chose not — pardon me, Mr. Steffler chose not to pay Cenex, but that's not the bank's fault. What was the purpose of having the checks endorsed with three persons, the bank, Cenex, and Mr. Steffler? My understanding, although that may not have been developed on the record, is that that is a common occurrence when you have the buyer of farm proceeds cutting a check. They put the names of everyone who likely has a security interest on it so that that person, that payer, is not in charge. Well, the whole reason Cenex was on it was because it was entitled to some funds. Correct. And it was depositing these funds on the representation of the bank that you sign here and we'll take care of you. I respectfully disagree with that. I believe the record reflects that the checks were taken to Cenex, Cenex signed off on the checks based on the agreement that the checks would be used to pay down Mr. Steffler's operating line and Cenex would be paid out of the operating line. Neither Cenex nor Mr. Steffler ever had any discussions about when are you going to pay me out of the operating line, and I submit that had Cenex thought they could have been paid out of the crop proceeds. What do you mean out of the operating line? That's what Cenex is maintaining it's entitled to, is that the funds that were coming for, say, selling the crops for 1998 would be paid to Cenex because it was providing it And yet it was willing to endorse the check because it was going to be, the funds were going to be held and they'd be paid. Otherwise it wouldn't have endorsed, would they? If they wanted to have it run that route, they could have endorsed it with a restrictive endorsement if they thought they were going to get the proceeds directly from that check. How about an equitable endorsement? That's an available theory. Your time is almost up. I would like the Court to uphold the district court's conclusion for any of the variety of reasons that we've cited, but I'd also like the Court to think about the policy reasons behind the waiver arguments and the equitable reinstatement. Thank you. Thank you. You had three minutes and 15 seconds. I just wanted to respond to one of the Court's questions about is it customary to check for termination statements as it often is for financing statements? And the answer to that is no, it's not at all. It's not at all practical. When you have a large creditor like a Cenex, for example, who receives literally hundreds of checks in a week or in a month, there's no way that any functioning business is going to take the time to check for a termination statement every single time it gets paid. That just doesn't happen in the business. I have one other question. You and opposing counsel seem to disagree on the question of whether if there was an equitable reinstatement that still Cenex would win. Absolutely. And the reason is Cenex, and this is in the record, by the way, all of the inputs that were delivered that year are specified in the record. It invested in that current year financing. The bank couldn't trace one dime of its advances. It doesn't know if Steffer went out and built a new house or bought a new house in 1998 like he did with his loan proceeds in 1997. There was a purchase of some personal property somewhere in there, right? In 1998. Was that it? Something was bought with it. I think what you're remembering is in 1997, as the bank's trying to figure out why it went so wrong on this credit, it discovered that he took money out of his operating line and went out and bought a new house with it. That's the problem with the tracing. And back to the equitable reinstatement, isn't there an equitable maximum that he who seeks equity must do equity? Come in with clean hands? Where's the bank's clean hands in this case? I mean, it knew the guy wasn't going to pay the day it signed the loan documents, and then it lied to Senex about its termination statement. I just don't see how you get to equity with those facts. Okay. Thank you so much. I appreciate your arguments. The matter will be submitted.
judges: Hug, Paez, Callahan